Opinion filed February 15, 2007

















 
 
  
 
 







 
 
  
 
 




Opinion filed February 15, 2007

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00270-CV 

                                                     __________

 

        JOE AND
VICTORIA MORRONE, INDIVIDUALLY AND AS NEXT

            FRIEND
OF EMMA MORRONE, A MINOR CHILD, Appellants

 

                                                             V.

 

                        PRESTONWOOD CHRISTIAN ACADEMY
AND

                                   ROBYN
GALE PRYOR,[1]
Appellees

 



 

                                         On
Appeal from the 199th District Court 

 

                                                          Collin County,
Texas

 

                                              Trial
Court Cause No. 219-2209-03

 



 

                                                                    O
P I N I O N

 








Joe Morrone and his wife, Victoria, for themselves
and as next friends of Emma Morrone, their daughter, sued Prestonwood Christian
Academy and Emma=s
kindergarten teacher, Robyn Gale Pryor. 
They sought damages allegedly resulting from Pryor=s verbal and emotional abuse directed
at Emma and at other students in Emma=s
presence.  Prestonwood and Pryor filed a
counterclaim for ADefamation-Slander
Per Se@ against
the Morrones.  They also sued Brenda Kaye
Caldwell, a former teacher=s
aide at Prestonwood.   All parties filed
motions for summary judgment.  The trial
court entered an agreed order of dismissal of the claims made by Prestonwood
and Pryor against Caldwell.
The trial court granted the motions for summary judgment and ordered that the
Morrones take nothing in their suit against Prestonwood and Pryor.  The court also entered a take-nothing
judgment against Prestonwood and Pryor on their counterclaim.  There is no appeal of the judgment granted to
Caldwell.  The Morrones, Prestonwood, and Pryor appeal
the remainder of the trial court=s
judgment.  We affirm.

The Morrones brought causes of action based upon
negligence (including negligence per se and gross negligence), intentional
infliction of emotional distress, and negligent misrepresentation. The Morrones
predicated Prestonwood=s
liability for Pryor=s acts
upon the doctrine of respondeat superior. 
The Morrones also alleged that Prestonwood failed to supervise Pryor,
that Prestonwood failed to investigate other complaints about Pryor, and that
Prestonwood was negligent in retaining her as a teacher.

 The
Morrones sought to recover for post-traumatic stress syndrome, serious mental
injury, severe psychological pain and suffering in the past and future, and
severe mental anguish in the past and future. 
They also alleged that Emma suffered from certain physical conditions as
a result of her mental anguish. 
Additionally, they sought damages to recover the cost of psychological
testing and counseling services as well as for financial losses in the amount
of the contract with Prestonwood. The Morrones also sought exemplary damages.

Prestonwood and Pryor filed a motion for summary
judgment on the claims against them; 
they advanced both traditional and no-evidence grounds.  Because our holding on the traditional motion
for summary judgment is dispositive of this appeal, we will not address the
no-evidence  motion for summary
judgment.  








We will apply the well‑recognized standard
of review for traditional summary judgments. A trial court must grant a
traditional motion for summary judgment if the moving party establishes that no
genuine issue of material fact exists and the party is entitled to judgment as
a matter of law.  Tex. R. Civ. P. 166a(c); Lear Siegler, Inc. v. Perez,
819 S.W.2d 470, 471 (Tex.
1991).   A defendant moving for summary
judgment on an affirmative defense must prove each element of its defense as a
matter of law, leaving no issues of material fact.  Johnson & Johnson Med., Inc. v.
Sanchez, 924 S.W.2d 925, 927 (Tex.1996). 
Once the movant establishes a right to summary judgment, the nonmovant
must come forward with evidence or law that precludes summary judgment.  City of Houston
v. Clear Creek
Basin Auth., 589 S.W.2d 671,
678-79 (Tex.
1979).  We take as true evidence
favorable to the nonmovant.  Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997); Nixon v. Mr. Prop. Mgmt. Co.,
690 S.W.2d 546, 548-49 (Tex.
1985).  When a trial court=s order does not specify the grounds
relied upon for its ruling, the summary judgment will be affirmed on appeal if
any of the summary judgment grounds advanced by the movant are
meritorious.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001); Carr v.
Brasher, 776 S.W.2d 567, 569 (Tex.
1989).

The summary judgment evidence
shows that Prestonwood Christian Academy,
a ministry of Prestonwood Christian Church in Plano, is a nonprofit private school.  Emma was a kindergartner in Pryor=s class at Prestonwood in 2002 and part
of 2003.  Pryor held a master=s degree in early childhood and family
services.  Caldwell, who held a Bachelor=s degree in interior design and a minor
in marketing, was Pryor=s
aide from October 2, 2002, until sometime in March 2003.

Victoria Morrone testified in her
deposition that, from October 2002, Emma showed signs of being unhappy.  She would on occasion tell Victoria that she had had a bad day.  She later, probably in December, began to
have nightmares.  She also began to wet
the bed as well as her pants, to exhibit anxiety and coping difficulties, and
to suffer from other emotional problems. 
These problems were discussed in detail in a report made by Dr.
Alexandria H. Doyle, a clinical psychologist who had examined and treated
Emma.  Because of our holding, although
the report was made a part of the summary judgment evidence, we will not reach
a discussion of Dr. Doyle=s
findings.  The Morrones removed Emma from
Prestonwood in March 2003 after Caldwell
related the essence of the following information to them.

Caldwell=s
deposition was made a part of the summary judgment evidence.  Not long after she began to work as Pryor=s aide, Caldwell began to notice what she thought was
disturbing and inappropriate behavior directed at the students by Pryor.








Caldwell described instances of the
disturbing and inappropriate behavior. 
One student in Pryor=s
class had a loud voice.  When the
student  would speak in a loud voice,
Pryor would tell her to go sit down, and the girl would cry.  This girl cried more than the rest of the
children.  Another student had trouble
staying on task and staying focused. 
Pryor grabbed his math paper from him and made him sit in front of the
math chart.  The boy cried.  Similar conduct was exhibited toward another
student.  He cried and shook
uncontrollably for ten to fifteen minutes. 
In her deposition, Caldwell
maintained that, while this sort of disturbing and inappropriate behavior would
not occur daily, it did occur on a weekly basis.  Pryor would make the students feel badly
about answering questions.  She would say
things to them such as, AWell,
that=s not
correct.  You didn=t
answer that correctly.  You should know
that.  You should know the answer to that
question.@  Caldwell
felt that Pryor=s
behavior was disrespectful and condescending. 
It was Ajust the
overall feel of the classroom.@

There were other instances
related by Caldwell.  Pryor yelled at a student for not getting his
work done.  Pryor=s
voice toned down when another teacher came in. 
Caldwell
also related what she called small inconsistencies.  If a child wanted to sharpen a pencil,
sometimes Pryor would let them and other times she would not.  On the occasions when she would not let them
sharpen the pencil, she would Araise
her voice and tell them, in a very abrupt manner, to go sit down.@ 
She would tell them that they were to sharpen their pencils at the start
of the day.  On another occasion, there
was a student who liked to tell stories. 
When he tried to tell Pryor a story, she made him stop and told him to
go sit down and Ait made
him sad.@  Someone told Caldwell that in a prior year her child had
been in Pryor=s class
and that the child said that Pryor was mean.

In March, Pryor implemented a Aheart tool.@  Pryor asked Caldwell to make a large heart and put it on
the bulletin board.  The purpose of the
heart tool was to promote loving attitudes. 
Pryor asked Caldwell
to put a verse about love on the heart.  Caldwell chose Alove one another.@ 
She also made smaller hearts with each child=s
name on it.  These smaller individual
hearts were pinned to the larger heart. 
If a child was seen not loving another child, that child had to remove
his or her heart from the bigger heart.  Caldwell testified that
one child had to remove her individual heart from the board.  The student Awas
crushed.@  Later in the day, during prayer time, another
child read her prayer list, and as a part of her prayer list, she said to pray
for the student because Ashe
has a selfish heart.@  If a child had to remove his or her heart
from the larger heart, it would be replaced the next day.  The child who had to remove her heart from
the larger heart was normally a very secure person but, on this occasion, Awas crushed.@








Regarding Emma, the first three
months she struggled with phonics and with math.  She improved as the year went on.  The first thing that Caldwell noticed about
Emma when Caldwell started working as an aide at Prestonwood was that Emma had
a Avery sad puppy dog look on her face.@ 
She also observed that Emma was struggling.  Emma would get up out of her chair and go to
Pryor for help.  Instead of helping Emma,
Pryor, Ain a very
abrupt and loud tone of voice[,] would tell Emma to go sit back down, that she
did not need help@; Emma
would cry.  This sort of thing would
happen about once a week between October 2002 and mid-January 2003.  Caldwell
referred many times to what she perceived to be Pryor=s
abrupt tone of voice as well as her disturbing, inappropriate, and abusive
behavior toward Emma and other students in Emma=s
presence.  Caldwell testified that there was nothing
else in Pryor=s
behavior that caused Emma to cry any more than the other students.  She did not consider Pryor=s behavior to be child abuse.  Neither did she believe that Pryor
intentionally caused emotional harm to the children.

Caldwell also testified that Pryor exhibited
inappropriate behavior toward her.  Pryor
corrected Caldwell
in the presence of the children.  On
another occasion, Caldwell gave a Christmas present to Pryor in front of the
class; and Pryor did not acknowledge her but, instead, just Ablew [her] off@
and humiliated her.  Another person told Caldwell that she had
noticed this incident.

Caldwell=s
affidavit also contains allegations that there was a lack of control, a lack of
discipline, and a lack of consistency in Pryor=s
class.  Pryor=s
class was difficult to control at times. She attributed it to Pryor=s lack of consistency.  Caldwell
also had trouble controlling the class when she substituted for Pryor.  She could not control them because she did not
feel that it was right to yell and scream at them.  On one such occasion, the children were
misbehaving, were being disrespectful, and were so out of control that it made Caldwell cry.  Another teacher came in and assisted Caldwell in controlling
the class.

Carole Rouse was a teacher at
Prestonwood.  A portion of her deposition
was made a part of the summary judgment record. 
Rouse testified about the habit of trying to match teachers to her
students who were moving up based in part on personalities and in part on
need.  Using this system, with input from
other teachers, there were certain students who would not be placed with a
particular teacher because of the belief that it would not be a good fit.

Robin Browning, a parent who
sometimes assisted in the classroom, told Caldwell
that she had concerns over discipline not only in Pryor=s
class but also in the school.  Browning
also witnessed Pryor raising her voice to the children and had been told by
another parent that Pryor had Ayanked@ their child=s
arm and yelled and screamed at him. 
Browning told Caldwell
that she thought that Pryor Awas
working on burnout.@








Caldwell attributed Pryor=s alleged disturbing and inappropriate
behavior to several things.  First, she
testified that some of Pryor=s
problems might be attributed to the fact that Pryor was having issues with a
daughter who was suffering from depression. 
Next, Caldwell
attributed Pryor=s treatment
of the students as well as others to what she called a Aheart
problem,@ meaning
that she Ahad
difficulty being nurturing, loving, warm, friendly, kind, considerate, [and]
compassionate.@

In her deposition, Caldwell said that Pryor
had the ability to make learning fun. 
Pryor was creative and gave the students an opportunity to have hands-on
experience when they would do science activities.  She could also sing, and the children liked
to sing with her.  Pryor would sing songs
that helped the students with math concepts. 
AWhen it
was group time, she had the ability to make learning fun for the kids.@ 
A[S]he had
a fun way of describing things to the children.@     Caldwell
did not report any of the alleged disturbing and inappropriate behavior until
March 15, 2003, when she told the Morrones. 
No one else told them about the alleged behavior.  Caldwell
was their only source.  Victoria Morrone
was a Aroom mom.@ 
She was in and out of the classroom often and also participated on field
trips.  She had helped Pryor in the
classroom.  She would listen to the
children read on a weekly basis for an hour to an hour and a half and would Acome in often to bring Emma lunch@ and sit with her while she ate.

The principal of the Prestonwood Lower School
during 2002 and 2003 was Donna Gilson. 
The summary judgment proof contained an affidavit by Gilson.  In the affidavit, Gilson said that she had
never received any complaints about Pryor before Caldwell complained in March 2003.  Gilson also examined the records in her
custody, including Pryor=s
personnel file, and found no complaints against Pryor before the Caldwell complaint.  The summary judgment evidence also contained
an affidavit by Paige DeLeon, principal of Prestonwood Lower
 School from the beginning
of the school year in 1997 until May 2002. 
She supervised Pryor, and she never received any complaints about
Pryor  Aacting
in an abusive, disturbing, inappropriate, or unprofessional manner@ toward any student or class at
Prestonwood.

Pryor claims that she is entitled
to immunity as provided for in the Paul D. Coverdell Teacher Protection Act of
2001, 20 U.S.C. ''
6731-6738.  Section 6736 provides in
relevant part:

(a) Liability protection for teachers

 

Except as provided in subsection
(b), no teacher in a school shall be liable for harm caused by an act or
omission of the teacher on behalf of the school if--








 

(1) the teacher was acting within
the scope of the teacher=s
employment or responsibilities to a school or governmental entity;

 

(2) the actions of the teacher
were carried out in conformity with Federal, State, and local laws (including
rules and regulations) in furtherance of efforts to control, discipline, expel,
or suspend a student or maintain order or control in the classroom or school;

 

(3) if appropriate or required,
the teacher was properly licensed, certified, or authorized by the appropriate
authorities for the activities or practice involved in the State in which the
harm occurred, where the activities were or practice was undertaken within the
scope of the teacher=s
responsibilities;

 

(4) the harm was not caused by
willful or criminal misconduct, gross negligence, reckless misconduct, or a
conscious, flagrant indifference to the rights or safety of the individual
harmed by the teacher.

 

The Morrones argue that Pryor=s claim of immunity fails for several
reasons.  The Morrones claim that the Act
applies only to teachers who are properly certified by the State.  Pryor was not certified as a teacher by the
State of Texas.  However, the Act applies also to those who
are Aauthorized
by the appropriate authorities.@  Section 6736(a)(3).  The summary judgment proof establishes that
Pryor has a master=s degree
in early childhood and family studies. 
The summary judgment proof also shows that she is authorized to teach in
private schools in Texas
under Prestonwood=s
accreditation through the Southern Association of Colleges and Schools.  We hold that Pryor was an authorized person
under the terms of the Coverdell Act. 

The Morrones also claim that the
Act applies only in states that receive funds Aunder
this chapter.@  Section 6734. 
They reason that, since Texas
does not receive funds under the Coverdell Act, Pryor is not entitled to the
protection of the immunity provisions of that Act.  Title 20 U.S.C. is the Title that is
dedicated to education.  Chapter 70 of
that Title provides for many things, including the distribution of funds to the
States.  Subchapter II of Chapter 70 contains
a Subpart 5 that is entitled ATeacher
Liability Protection,@
otherwise known as the APaul
D. Coverdell Teacher Protection Act of 2001.@  Because Texas receives funds Aunder
this chapter@ (Chapter
70), Pryor is entitled to the immunity provided by the Act unless she is
excluded from its protections for reasons stated in the Act, which we will now
discuss.








The final argument that the
Morrones make regarding the inapplicability of the immunity provisions of the
Coverdell Act is that the Act does not apply to claims of intentional or
criminal misconduct or gross neglect. 
The Act provides that there is no immunity for willful misconduct
or  Acriminal
misconduct, gross negligence, reckless misconduct, or a conscious, flagrant
indifference to the rights or safety of the individual harmed by the teacher.@ 
Although the Morrones argue this point generally, we think it necessary
to examine individually the various exceptions.

We will first discuss willful
misconduct and gross negligence.  The Act
defines neither Awillful
misconduct@ nor Agross negligence.@ 
However, Texas
cases are instructive on the general definitions of the concepts.  

The court in Wheeler noted
that Awillful@ is like the phrase Aheedless and reckless disregard@ and means Athat
entire want of care which would raise the belief that the act or omission
complained of was the result of a conscious indifference to the right or
welfare of the person or persons to be affected by it.@  Wheeler v. Yettie Kersting Mem. Hosp.,
866 S.W.2d 32, 50 n.25 (Tex. App.C
Houston [1st Dist.] 1993, no writ) (citing Burk Royalty Co. v. Walls,
616 S.W.2d 911, 916-20 (Tex.
1981)).  The court in Burk said
that the term is synonymous with Agross
negligence.@  Burk Royalty, 616 S.W.2d at 920.  If, on the other hand, Awillful@
means Aintentional,@ as argued by the Morrones, then Pryor=s conduct, to remove her from the
protection of the Coverdell Act, would amount to an intentional tort.  The fundamental difference between negligent
injury or even grossly negligent injury and intentional injury is the specific
intent to inflict injury.  Reed Tool
Co. v. Copelin, 689 S.W.2d 404, 406 (Tex.
1985).  In the Restatement (Second) of
Torts, intent is defined to mean that Athe
actor desires to cause consequences of his act, or that he believes that the
consequences are substantially certain to result from it.@ 
Restatement (Second) of Torts
' 8A (1965).

The commonly accepted legal
meaning of  Agross
negligence@ is Aan act or omission involving subjective
awareness of an extreme degree of risk, indicating conscious indifference to
the rights, safety, or welfare of others.@  State v. Shumake, 199 S.W.3d 279, 287
(Tex. 2006).

According to the Restatement
(Second) of Torts, reckless conduct occurs when a person:








[D]oes an act or intentionally fails to do an act which it is
his duty to the other to do, knowing or having reason to know of facts which
would lead a reasonable man to realize, not only that his conduct creates an
unreasonable risk of physical harm to another, but also that such risk is substantially
greater than that which is necessary to make his conduct negligent. 

 

Restatement
(second) of Torts '
500 (1965).

 

Reckless conduct is also
described as conduct that is Awanton
or wilful.@  Id.
' 500 Special Note.  Reckless conduct is different from negligence
that is Amere
inadvertence, incompetence, [or] unskillfulness.@  Id.
' 500 cmt. g.  AReckless
misconduct requires a conscious choice of a course of action, either with
knowledge of the serious danger to others involved in it or with knowledge of
facts which would disclose this danger to any reasonable man.@ 
Id.

Next, we will examine whether the
summary judgment evidence shows that Pryor was guilty of criminal misconduct so
as to lose the protection otherwise afforded by the Coverdell Act.  The Morrones argue that Pryor violated Tex. Pen. Code Ann. ' 22.04 (Vernon Supp 2006).  Section 22.04 provides as follows:

 (a) A person commits an offense if he
intentionally, knowingly, recklessly, or with criminal negligence, by act or
intentionally, knowingly, or recklessly by omission, causes to a child, elderly
individual, or disabled individual:

 

(1) serious bodily injury;

(2) serious mental deficiency,
impairment, or injury;  or

(3) bodily injury.

 

Tex. Pen. Code Ann. ' 6.03 (Vernon 2003) defines each of the
culpable mental states as follows:

(a) A person acts intentionally,
or with intent, with respect to the nature of his conduct or to a result of his
conduct when it is his conscious objective or desire to engage in the conduct
or cause the result.

 

(b) A person acts knowingly, or
with knowledge, with respect to the nature of his conduct or to circumstances
surrounding his conduct when he is aware of the nature of his conduct or that
the circumstances exist.  A person acts
knowingly, or with knowledge, with respect to a result of his conduct when he is
aware that his conduct is reasonably certain to cause the result.

 








(c) A person acts recklessly, or
is reckless, with respect to circumstances surrounding his conduct or the
result of his conduct when he is aware of but consciously disregards a
substantial and unjustifiable risk that the circumstances exist or the result
will occur.  The risk must be of such a nature
and degree that its disregard constitutes a gross deviation from the standard
of care that an ordinary person would exercise under all the circumstances as
viewed from the actor=s
standpoint.

 

(d) A person acts with criminal
negligence, or is criminally negligent, with respect to circumstances
surrounding his conduct or the result of his conduct when he ought to be aware
of a substantial and unjustifiable risk that the circumstances exist or the
result will occur.  The risk must be of
such a nature and degree that the failure to perceive it constitutes a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor=s
standpoint.

 

Before Pryor could be found to
have committed an offense under Section 22.04, her acts must have been such
that she intentionally, knowingly, recklessly, or with criminal negligence by
an act or intentionally, knowingly, or recklessly by an omission caused serious
bodily injury, serious mental deficiency, impairment, or injury, or bodily
injury to Emma.  The only summary
judgment evidence in this regard comes from Caldwell, and she testified that she did not
believe that Pryor intended to cause emotional harm to the children.  

Perhaps the methods shown by the
summary judgment evidence to have been used by Pryor might have been less than
ideal, but that is not the question before us. 
Our task is to determine whether she has conclusively proven as a matter
of law that she is entitled to the affirmative defense of immunity under the
Coverdell Act.  We hold that she
has.  The trial court did not err when it
granted summary judgment for Pryor.[2]  And, we further hold that qualified immunity
also protects Prestonwood from the derivative claims filed against it and that
the trial court did not err when it granted Prestonwood=s
motion for summary judgment.  








The Morrones also claimed that
Prestonwood negligently supervised Pryor, failed to investigate prior
complaints, failed to discover and prevent emotional abuse by Pryor, and failed
to protect Emma.  Although several
statements of fact are made regarding the content of the summary judgment
record, no record references on this point are made in the brief.  We will nevertheless discuss the issue.

One of the elements of a
negligence cause of action is proximate cause, and proximate cause consists of
cause in fact and forseeability.  Doe
v. Boys Clubs of Greater Dallas, Inc., 868 S.W.2d 942, 951-52 (Tex. App.CAmarillo 1994), aff=d, 907 S.W.2d 472 (Tex. 1995).  In Doe, a volunteer for the Boys Club
sexually abused various individuals.  The
volunteer had been convicted twice for misdemeanor driving while
intoxicated.  In a suit against the club,
the victims claimed that the club was negligent in not conducting a proper
investigation.  The Amarillo court held that, even if a duty were
breached by the club, the injury was not foreseeable.  868 S.W.2d at 952.  The court found that knowledge of the two DWI
convictions would not have put the club on notice that the volunteer might be a
pedophile.  Id. 
On appeal to the Texas Supreme Court, that court focused on the cause-
in-fact requirement of proximate cause:

We conclude that if the Boys Club
breached a duty to investigate, screen, or supervise volunteers, this breach
was not the cause in fact of the plaintiffs=
injuries.  Assuming the Boys Club had
investigated [the volunteer=s]
criminal record, revelation of the two misdemeanor DWI convictions would not
have precluded [his] presence at the club. 
The club knew that [he] was a probationer under court order to perform
community service;  further investigation
would only have provided details about the nature of his offenses.  There is no evidence that the Boys Club would
not have taken [him] as a volunteer if it had known he had been convicted for
driving while intoxicated.  We conclude
that [his] presence at the club was not due to breach of any duty to screen or
to investigate.  

 

Doe, 907 S.W.2d at 477-78.








The basis of liability in a
negligent hiring case is the employer=s
own negligence (not the negligence of the employee) in either hiring or
retaining one whom the employer either knows or should have known was unfit or
was not competent for the job and that such acts or omissions resulted in an
unreasonable risk of harm to others.  Wise
v. Complete Staffing Servs., Inc., 56 S.W.3d 900, 904-05 (Tex. App.CTexarkana
2001, no pet.).   If Prestonwood in some
way breached a duty to the Morrones by failing to check on Pryor either before
or during her period of employment, the summary judgment evidence shows that as
a matter of law any such breach did not proximately cause the damages alleged
by the Morrones.  Nothing would have been
found that would have caused Prestonwood not to hire or to fire Pryor.  Any breach would not have been the proximate
cause of the injuries alleged by the Morrones because there was no act or
omission that was the cause in fact of the alleged injuries and because the
injuries were not foreseeable.  Doe,
907 S.W.2d at 477-78; Doe, 868 S.W.2d at 951-52.  The trial court did not err in granting
summary judgment on this issue.

Regarding their cross-appeal,
Prestonwood and Pryor complain in one issue that they did not receive
twenty-one days notice of the hearing on the Morrones=
motion for summary judgment.  See Tex. R. Civ P. 166a(c).  Prestonwood and Pryor have not shown by this
record that either objected to the lack of notice in the trial court.  Neither does the record show a request for
continuance or a motion for new trial. 
Prestonwood and Pryor have waived the issue, and their sole issue on the
cross-appeal is overruled.   Delta (Del.) Petroleum &
Energy Corp. v. Houston Fishing Tools Co., 670 S.W.2d 295, 296 (Tex. App.CHouston [1st Dist.] 1983, no writ).

The judgment of the trial court
is affirmed.

 

 

JIM R. WRIGHT

CHIEF JUSTICE

 

February 15, 2007

Panel consists of: 
Wright, C.J.,

McCall, J., and Strange, J.











[1]We note that in the briefs and judgment in this case
Pryor=s first name is spelled as AR-o-b-y-n@ and as AR-o-b-i-n.@  Because she used the former in her brief, we
will also spell the name ARobyn.@  The same is
true as to the spelling of AGale.@





[2]We note that it has long been the policy of the State
of Texas to
give school teachers the necessary support to enable them to efficiently
discharge their responsibilities.  Hogenson
v. Williams, 542 S.W.2d 456 (Tex. Civ. App.CTexarkana
1976, no writ).  This policy is apparent
in the provisions of Tex. Educ. Code
Ann. ' 22.0511 (Vernon 2006). 
Section 22.0511(a) and its predecessor, Tex. Educ. Code '
22.051(a) (1995), both provide:

 

A professional employee of a school district is not
personally liable for any act that is incident to or within the scope of the
duties of the employee=s position of employment and that involves the exercise
of judgment or discretion on the part of the employee, except in circumstances
in which a professional employee uses excessive force in the discipline of
students or negligence resulting in bodily injury to students.

 

Effective September 1, 2003, the immunity provided
under Section 22.0511(a) was extended to include that afforded under the Paul
D. Coverdell Act and applied the immunity to those who provide services to
private schools as well.  Section
22.0511(c). 

 

The policy is also evidenced in the application of immunity to charter
schools and employees.  See Tex. Educ. Code Ann. ' 12.1056 (Vernon 2006).